[891 NYS2d 878]

In the Matter of Mendis Brown, Petitioner, v New York City
Department of Education et al., Respondents.

Supreme Court, New York County, December 2, 2009

### APPEARANCES OF COUNSEL

*Bruce K. Bryant*, Brooklyn, for petitioner. *Michael A. Cardozo, Corporation Counsel*, New York City (*Steven Weber* of counsel), for New York City Department of Education, respondent.

### OPINION OF THE COURT

NICHOLAS FIGUEROA, J.

Petitioner, a public school principal, brings this CPLR article 78 proceeding to annul the City Corporation Counsel's refusal to provide her with legal counsel, pursuant to General Municipal Law § 50-k (2), in her defense against a suit brought by one of her former students in federal court. Petitioner challenges such denial as arbitrary and capricious.

Section 50-k (2) of the General Municipal Law provides, in relevant part, as follows:

> "At the request of the employee [of a City department] . . . , the city shall provide for the defense of [the] employee . . . in any civil action . . . in any . . . court . . . arising out of any alleged act . . . which the corporation counsel finds occurred while the employee was acting within the scope of his public employment and in the discharge of his duties and was not in violation of any rule or regulation of his agency at the time the alleged act . . . occurred."

Thus, the Corporation Counsel is not required to assign legal representation if he finds that either one of the conditions specified by the statute (regarding scope of employment and regulatory infraction) is not satisfied. His determination in such respects cannot be nullified unless it "lacks a factual basis" (*Matter of Williams v City of New York*, 64 NY2d 800, 802 [1985]; *Matter of Bolusi v City of New York*, 249 AD2d 134 [1998]).

The Corporation Counsel bases his refusal to make such assignment in this case on the following.

Petitioner has been employed by the Department of Education in various teaching, administrative, and supervisory capacities for more than 23 years. In recent years, she has been the principal of an intermediate school in Brooklyn. In early December 2006, petitioner was asked to select a student from

her school to compete in an upcoming regional round of a spelling bee (the Regional Competition) for that year's National Spelling Bee. Petitioner delegated the school librarian to arrange a school-wide competition to determine the student to represent the school at the Regional Competition. Accordingly, the librarian asked each English teacher to nominate a student. However, only one teacher complied, by sending A, a student in her eighth-grade special education class. The librarian informed A that he would be representing the school in the Regional Competition. Then, in an e-mail to petitioner, the librarian reported that, although she had made "efforts to conduct a spelling bee," she was submitting A's name as the sole entrant since the other teachers had sent no other nominees. Petitioner replied that it was "too high stakes to send a child that will not be able to cope." Petitioner then directed the librarian to arrange for two students from each language arts class to compete in a school-wide spelling bee.

The competition was held a day later, and A and another special education student, C, participated. A, however, was eliminated in the first round.

After his disqualification, A reported to the librarian that petitioner had told him that he could not participate in the Regional Competition because it would be too pressure-filled for him to do well, and the school would accordingly "look bad." A also claimed that petitioner had stated that he "did not have the brains" to participate in the Regional Competition.

At about this time, the librarian advised petitioner that student B had won the school-wide competition. When student B declined to participate in the Regional Competition, the librarian reported to petitioner that the first runner-up was student C, one of A's special education classmates. According to the librarian, petitioner expressed concern that a special education student would represent the school and asked whether the second runner-up, D, could substitute. Although it is unclear who ultimately appeared for the school, D was not in fact so enlisted. Although it is also not clear whether B ultimately changed her mind and proceeded to the Regional Competition or whether C went in her stead, one or the other of them appeared at the competition on behalf of the school.

The record is uncertain as to when the Regional Competition was held. However, during January 2007 administrative charges were filed (the administrative complaint) with the Chancellor's Office of Special Investigations concerning what petitioner had

stated to A. An investigator was immediately assigned to probe the administrative complaint's sole allegation, i.e., that petitioner had told A that "he should not represent the school at a spelling bee competition because he has no brain and cannot read."

On June 12, 2008, an action was commenced on A's behalf in the United States District Court for the Eastern District of New York against petitioner, the City, and the Department, based on allegations that A had been discriminated against as a special education student. The federal pleading (the federal complaint) averred that A had "won the Spelling Bee Contest open to all students within the school," that he had been told by petitioner that he was not "smart" or "bright" enough to compete, and that he was thereby deprived of his right to compete in violation of federal and state civil and human rights statutes and the Americans with Disabilities Act. Compensatory and punitive damages were sought for, among other things, emotional distress.

Some two weeks later (a year and a half after the Chancellor's office had initiated its investigation), the investigator filed her report, dated July 1, 2008, which, among other things, described several interviews that the investigator had undertaken in connection with the administrative complaint.

The investigator's first interview, conducted via telephone, was of A himself, on February 1, 2007 (almost a year and a half before the report was filed). According to the investigator, A confirmed that he initially had been the only student sent to the library for the school-wide competition; that he had heard the librarian call petitioner; and that the librarian had "told [petitioner] that, as . . . A was the only student to appear, he would be deemed the overall winner."

Other interviewees included: (1) the librarian, who reported that A had told her that petitioner had told him "that he could not participate in the regional spelling bee because he would be under a lot of pressure and she did not think he was the right person to represent the school" and that " 'he did not have the brains to compete' "; (2) another teacher who had helped to administer the school-wide competition and who recalled that petitioner had "at no time . . . [told] her that any of the students, including . . . A, were incompetent to compete in the spelling bee"; (3) a regional special education administrator, who recalled having been told by A that petitioner had "stated that he could not compete at the regional level because he had

no brains and would make the school look bad"; (4) a school payroll secretary who had no information to offer about the events in question; (5) the school secretary, whose desk was located near petitioner's office and who "said that she saw [A] walk out of [petitioner's] office some time in February of 2007 . . . [and that he] appeared upset and his eyes were watery . . . [and that when she] asked [A] what was wrong . . . he told her that he could not participate in the spelling bee"; and (6) petitioner, who claimed "not to recall speaking with [A] in her office, and stressed that she would never tell any student that he or she was not smart enough to participate in a school event."

The report concluded that

> "[b]ased upon the information uncovered during the course of this investigation, which includes A's statement to various staff members that [petitioner] told him that he could not participate in the spelling bee because he would be eliminated early and would make the school look bad, and the contents of [petitioner's] email [in reply to the librarian's e-mail in December of 2006], this investigator has deemed the allegation substantiated."

The report concluded with the recommendation that "a Technical Assistance Conference be convened to determine what appropriate disciplinary action should be taken" against petitioner.

The report, dated July 1, 2008, followed on the heels of the filing of the federal complaint. By a letter dated July 2, 2008, a lawyer writing on petitioner's behalf asked the Corporation Counsel to provide petitioner with legal representation in her defense against the federal complaint. By a letter dated August 4, 2008, the Corporation Counsel declined to do so, but cited no ground for his determination. After petitioner's lawyer sought reconsideration, the Corporation Counsel replied with a letter, dated August 22, 2008, confirming that he saw "no reason to alter [his] decision not to represent [petitioner] in the [federal] action." This letter too offered no explanation.

Some six months later, on January 22, 2009, after the present proceeding had been commenced, a letter was sent to petitioner by the superintendent of her school district announcing the conclusion the superintendent had reached after meeting with petitioner and her union representative at three conferences between late August and mid-November 2008. The superintendent noted that petitioner and her representative contested A's

version of the facts and that petitioner denied that she had spoken with A about the spelling bee, much less made the comments that he had attributed to her. The superintendent, however, stated her conclusion that petitioner

> "did engage in conduct unbecoming your position, acted inappropriately, used poor judgment and violated Chancellor's Regulation A-421, which prohibits verbal abuse, when you stated to Student A, a special needs student, that he could not participate in the regional spelling bee because he would be eliminated early and would make the school look bad."

As noted above, section 50-k (2) does not require an assignment of counsel where the act for which the employee has been sued occurred (if at all) outside the scope of her employment. The Corporation Counsel maintains that such is the case here, where petitioner is being sued for having discriminated against A by not sending him on to the Regional Competition as the school's representative. Such argument is discussed at some length on the possibility that it might not fall of its own weight.

In proposed support of his position in such respect, the Corporation Counsel cites three decisions concerning section 50-k (2), *Matter of Vitucci v City of New York* (272 AD2d 620 [2000]), *Ladalia v City of New York* (1993 WL 217145, 1993 US Dist LEXIS 8142 [ED NY, June 2, 1993]) and *Blood v Board of Educ. of City of N.Y.* (121 AD2d 128 [1986]).

The opinion of the Appellate Division, Second Department, in *Vitucci*, on an unreported decision below, does not describe the facts of the case, and the Corporation Counsel, although privy to such facts as a named party, has chosen not to disclose them. The facts before the *Ladalia* court, however, are described in its decision. In that case, a prison warden had asked the Corporation Counsel to assign him legal representation in his defense against charges of sexual harassment of his subordinates. The *Ladalia* court upheld the Corporation Counsel's refusal to make such assignment. Thus, the *Ladalia* ruling stands for the proposition that the Corporation Counsel need not supply a lawyer under section 50-k (2) where the conduct for which the employee is being sued could not by any stretch of imagination have been committed by the employee qua employee, but rather, could have served only his personal objectives.

As for the *Blood* case, the article 78 petitioner there was a teacher who "in a fit of rage" (as a letter of reprimand put it)

had attempted to wrest a book bag from one student and in the process had badly injured the eye of another (121 AD2d at 131). The *Blood* court decided that the Corporation Counsel was arbitrary and capricious when he refused to provide the teacher with legal representation for her defense since her lashing out at the student was a "foreseeable" incident of the stresses of her job, and the injury she had caused appeared to have been unintentional. Under such circumstances, the *Blood* court concluded, the teacher had been acting within the scope of her employment and therefore was entitled to the benefit of counsel as required under section 50-k (2).

Thus, the *Blood* court invoked "foreseeability" as the mark of whether the conduct at issue falls within or outside the scope of employment for purposes of section 50-k (2). But the Corporation Counsel proposes that *Blood* turned on the fact that the damage done by the teacher had been unintended. In the end, the distinction for which the Corporation Counsel argues is not particularly helpful, given the fact that *Blood* also involved intended action (the teacher's lashing out and intentionally grabbing the book bag), even though the bystander's eye injury was a result for which she had not aimed. For that matter, the federal complaint alleges not only an intentional act on petitioner's part, i.e., discrimination against A, but also a result that the record nowhere suggests was intended by petitioner (including emotional distress, not to mention the 12 year old's loss of "back pay" and "future pay"). Moreover, the very language of the statute should be enough to refute the distinction offered by the Corporation Counsel, since section 50-k (2) expressly extends its protections to defense against suits under 42 USC § 1981 *et seq.* (which mainly, if not entirely, involve intentional acts, including invidious discrimination).

In any event, the gravamen of the federal complaint (whether or not tenable) is that—in choosing a student to represent the school at the Regional Competition—petitioner misjudged the implications of the special-education category and misjudged the importance of an actual school-wide competition as a step in the process of identifying such a representative. By contrast, there is no suggestion in the federal complaint (nor in any other part of the record upon which the Corporation Counsel's determination was based) that petitioner had been prompted to such decision by some self-serving agenda, such as bribery from a third party or animus toward A or personal antipathy toward special education students as a category. In other words, the

record nowhere hints that petitioner's decision to proceed as she had originally directed (by a school-wide spelling bee) might have been a frolic and detour from her efforts to do her job.

Simply put, it could scarcely be clearer that the federal action concerns petitioner's exercise of discretion (whether wise or foolish, sensitive or insensitive) in carrying out an aspect of her responsibilities as the school's principal. Indeed, to conclude that petitioner does not meet the scope-of-employment requirement would leave all employees who are vested with discretion vulnerable to the supposed logic that they are not employed to make bad judgments and that their alleged missteps therefore disqualify them from having the protection promised by section 50-k (2). In other words, for such employees the statute would be largely eviscerated. Moreover, a subversion of the statute's purposes would be no small matter from a policy point of view. For, as the *Blood* court observed (121 AD2d at 132): "[T]he statute is primarily directed at saving imperfect and, therefore, fallible public employees from the potentially ruinous legal consequences following from unintentional lapses in the daily discharge of their duties. It is in this light that the Corporation Counsel's defense obligation must be viewed."

It remains to be decided, however, whether the second ground raised by the Corporation Counsel has merit. In this connection, the Corporation Counsel's argument is simple enough: according to him, petitioner "violated a rule or regulation of [her Department] at the time the alleged act . . . occurred," and therefore has no entitlement to counsel under the express terms of section 50-k (2). The regulation upon which the Corporation Counsel now rests (but which he did not cite in his two letters of August 2008 and which was first invoked by the Department only in January 2009, i.e., after the present proceeding was commenced) is New York City Department of Education, Chancellor's Regulation A-421, which forbids verbal abuse of a student (including belittling language). It is further observed that under section 50-k (5) (a), "[if] the act . . . upon which the court proceeding against the employee is based was or is also the basis of a disciplinary proceeding by the employee's agency against the employee, representation by the corporation counsel . . . may be withheld . . . until such disciplinary proceeding has been resolved . . . ."

As the Corporation Counsel points out, his determination to deny legal representation to petitioner should be evaluated on the facts and record that were before him when he made such

determination (*Banks v Yokemick*, 144 F Supp 2d 272, 279 [2001]). In such light, the following matters are pertinent.

At the time the Corporation Counsel refused to provide legal representation under section 50-k (2), the report of the investigator had been filed, with its conclusion that the allegation of the administrative complaint was "substantiated." But the circumstances under which the report was filed and the "substance" on which its conclusion relied were, simply put, highly dubious. After all, the investigator's assignment had been limited to the very narrow inquiry framed by the administrative complaint. As a practical matter, such inquiry concerned two alternatives: the school principal had either made the childish and hurtful remarks of which the child had accused her or she had not. It was of course conceivable that the adult professional had stooped so low. It was at least equally plausible, however, that the child had simply inferred such remarks as the tacit sub-text of the disappointing message that had just been conveyed to him, i.e., that he was not being recognized as having (as his federal complaint put it) "won" a school-wide spelling bee. Moreover, there had been only two persons privy to the communication at issue—the child and the principal. Nevertheless, and even allowing for some arguable value to the double and triple hearsay that the investigator had paused to gather from third persons, she had not filed her report until about a year and a half after her interview with one of the two participants in the alleged communication. Furthermore, such filing was not done until shortly after the Department (and the Corporation Counsel, for that matter) had received notice of the federal complaint.

As it happened, even ignoring the questionable timing of the report, its contents were scant support for its conclusions, even as to the lone allegation raised by the administrative complaint. The investigator had interviewed the child only once and on the telephone. Thus, she had not been able to assess the child's demeanor, much less vouchsafe that his responses were independent of any prompting from a third party. She had also interviewed petitioner, a seasoned veteran of the Department as a teacher and supervisor, who had challenged the child's account (not just by failing to recall having spoken with him at the time in question, but also, by categorically denying that she had or could have made the sophomoric utterances of which she was accused). None of the third-party interviewees had been witnesses to the accused communication. A number of them,

however, had apparently repeated the child's hearsay accusations as though his retelling of them added substance to the accuracy of his account. Indeed, the report itself recited the fact of such hearsay without any hint of awareness on its author's part that such repetitions amounted to mere bootstrapping.

Moreover, the timing of the report was, per se, a reason for concern about the reliability of the interviews conducted by the investigator. As indicated above, the investigator had interviewed the child immediately after being assigned to look into the administrative complaint (albeit some two months after the communication it alleged), and she had thought it appropriate to identify the date on which such interview occurred. By contrast, her report did not identify the date or dates on which she had spoken to the other interviewees (who, as Department employees, were all readily accessible). If she had spoken to such third parties at or near the same time as she had spoken to the child, she did not explain why her report was nevertheless filed only a year and a half later. On the other hand, if she had instead spoken to them months or a year or more after the events in issue, the accuracy of their recollections at that point would be problematic. In any event, the one interviewee who had purportedly corroborated the child's claim that petitioner had spoken to him at about the time of the school-wide spelling bee recalled having seen the child leave petitioner's office at some point in February 2007, i.e., two months or more after the accused communication between the child and petitioner could have occurred. In short, it could not rationally be concluded that what the investigator had gathered from her interview of the child over the telephone in February 2007 was "substantially" reinforced by input from the other interviewees.

In sum, the Corporation Counsel did not have a substantial basis to find that petitioner had violated a Department regulation by making the abusive remarks as alleged by the administrative complaint. Nor does the Corporation Counsel argue that the provisions of section 50-k (5) are implicated here. In other words, the Corporation Counsel apparently acknowledges that the departmental measures taken in the wake of the administrative complaint do not add up to a pending "disciplinary proceeding" (see Education Law § 3020-a) within the meaning of the subdivision.

Moreover, even if there had been firmer ground for the Corporation Counsel to have found verbal abuse as alleged in the administrative complaint, it would not have followed that

petitioner had lost the right to be represented by him under the circumstances. This is not to ignore that the Corporation Counsel owes his first allegiance to the City and, where an employee and the City are joined as codefendants, he cannot represent the employee if her defense would be at odds with the City's (see *Mercurio v City of New York*, 758 F2d 862 [1985]). But the federal complaint's allegations that petitioner had made certain insensitive remarks to A (which were, notably, rather different from the belittling remarks that the administrative complaint had attributed to her) are at most tangential to the causes of action for discrimination that the federal complaint attempts to state. Indeed, for purposes of any defense motion on the pleadings or for summary judgment, such tangent would appear beside the point, given the theory underlying the federal complaint's claims (i.e., that A had a "right" to represent the school at the Regional Competition and that he was prevented from doing so because he was a special education student). In the face of an action based on such purported discrimination, it behooved the Corporation Counsel to note strong evidence of at least two facts in the record already available to him when he refused to represent petitioner in a joint defense: (1) there had been no school-wide competition of which A could supportably declare himself to have been the "winner"; and (2) A had been taken out of the running as the school's spelling champion based on his performance in the school-wide contest that eventually took place. Moreover, the same record contained no evidence that petitioner (or any other Department employee) had manipulated the results of the school spelling bee that was ultimately held, either by preventing the best performer at the spelling bee from representing the school at the Regional Competition or by stopping A from competing in the spelling bee. Under such circumstances, a joint defense in such an action could even assume, arguendo, that the remarks attributed to petitioner had been uttered and yet still move for summary dismissal. In other words, there was no inevitable conflict in the interests of petitioner, on the one hand, and her codefendants, on the other, to prevent the Corporation Counsel from serving in the defense of all three (see *Mercurio v City of New York*, supra).

Based upon the foregoing, it is concluded that the challenged decision by the Corporation Counsel not to represent petitioner in the federal action was arbitrary and capricious and thus must be nullified.

In addition to seeking to annul the Corporation Counsel's decision, the petition asks for an order directing that petitioner be reimbursed for any fees that she will be obliged to incur for private representation in the federal action. The petition also seeks a further order reimbursing petitioner for any liability that she may incur as a defendant in the federal action. Petitioner does not allege, however, that any such fee or liability has been incurred, and her petition in these two respects is therefore premature.

Accordingly, it is adjudged that the Corporation Counsel's determination to deny petitioner's request for representation in the federal action under section 50-k (2) of the General Municipal Law was arbitrary and capricious, and the Corporation Counsel is hereby directed to file his notice of appearance for petitioner in such action within 10 days of service of a copy of this decision with notice of entry; and it is further adjudged, that petitioner's requests for reimbursement of legal fees and for indemnification are denied without prejudice.